HELEN M. SAUNDERS, Appellee, v. M. F. SAUNDERS, Appellant.

No. 40690.

FEBRUARY 10, 1931.

*T. A. Goodson* and *Buell McCash*, for appellant.

*H. C. & H. C. Taylor* and *Milton Roberts*, for appellee.

EVANS, J.—I.  The parties were married in Davis County, in June, 1916.  At the time of the marriage, the plaintiff was 32 years of age, and the defendant 64.  The plaintiff was the mother of three children by a previous marriage, and these, with their mother, became a part of the `household of the defendant.  The parties lived together in apparent harmony until August, 1929, when this suit was begun.  The principal trouble between the parties, which ever found expression, related to money matters. The defendant had been previously married, and had lived happily with his family, which consisted of wife and a daughter.

The daughter died in 1905. The wife died in 1912, leaving the defendant as the sole survivor of the family. In 1904, the plaintiff was a domestic in the family of the defendant. She was a friend of the daughter's, Nora, and was regarded with affection by the parents of Nora. Prior to 1904, she had married, and had later separated from her husband. Pending such separation, the husband died, and shortly thereafter, the plaintiff married again. That marriage was dissolved in a divorce suit brought by the plaintiff. Three children were the issue of the marriage, and were awarded to the custody of the plaintiff. They were William, Naomi, and Winona. The alimony awarded plaintiff in that case consisted of a home in Ottumwa, worth $1,500, and mortgaged for about one half its value. She had no other property resource for the support of herself and children.

The defendant was a resident of Bloomfield, and had a large home there. Near by was his farm of 672 acres. He had personal property, including moneys and credits, to the amount of $15,000 to $20,000. None of his property was encumbered. In her petition for divorce, the plaintiff alleged that the defendant was worth $75,000 at the present time, and she prayed for alimony in the sum of $25,000. She prayed also for the custody of the child Margaret, born of the marriage, in 1918. The court awarded her alimony in the sum of $7,500 and the life use of the home. It was also decreed that he pay to the plaintiff for the benefit of the child Margaret, the sum of $50 per month, and that he pay all the costs of the litigation, amounting to upwards of $1,000, including attorney fees of plaintiff's counsel.

The question presented to us is whether the burden of alimony and support imposed upon the defendant is excessive, having due regard to all the facts and circumstances in the case. This involves an investigation of property values and income available therefrom. It also involves a consideration of that equity which inheres in the dissolution of a marriage, and which may be greater or less in favor of one party or the other, according to the circumstances of the particular case. The district court has adjudicated the right of the plaintiff to the divorce. As to that adjudication we have no power of reversal or review. Nevertheless, we are under obligation to consider all the evidence, in order to discover the aggravations and the palliations of the mutual conduct of the parties. In the light of these, we must,

on the one hand, ascertain the necessities and deserts of the plaintiff, and on the other, the necessities and palliations and financial ability of the defendant himself. For this purpose, we must consider the evidence *de novo*.

We find a large part of the record devoted to an issue which ought not to be in dispute at all. That is the question of the defendant's financial ability. It is the plaintiff's contention, and apparently her belief, that the defendant has sequestered and concealed from her a large amount of his property, and that he has the same in hiding in some mysterious place where it cannot be found. She estimates such concealed property as amounting to $15,000 or $20,000. The first and only premise of the plaintiff on that issue is that the defendant had $15,000 or $20,000 in personal property when she married him. Where is it? The defendant is a comparatively frail man, afflicted with heart trouble, —angina pectoris in an advanced stage. He has no earning capacity, apart from the supervising of his property. During the years of his marriage, the only source of his income has been the rental from the farm. This has amounted to $3,350 per year for the first 10 years, and $3,000 per year thereafter. Taxes paid by him amounted approximately to $1,000 a year. The upkeep of the farm amounted to $300 or $400 a year. In the earlier years of the marriage, interest accrued upon the moneys and credits. In 1916, the defendant's assessment roll showed $6,000 moneys and credits. By 1920, this was reduced to $2,200. In 1921, this item disappeared, and never reappeared in the assessment rolls. Overdrafts at the bank became more and more frequent. Notes were given, to take up the overdrafts, and this process continued down to the time of the beginning of this suit, when the indebtedness of the defendant had mounted to more than $17,000. Most of this indebtedness was held by the bank itself, and was represented by notes signed by both husband and wife. From the beginning, the plaintiff had the right of checking on her husband's account. She exercised the right freely. The usual form of her signature was "M. F. Saunders, by wife." She issued checks for the payment of all the needs of herself and her children. The defendant assumed the burden of the support of these children willingly. But they presented a grave problem, nevertheless, and as they grew, the problem grew apace. The mother responded to their every call, and at the expense of her husband. They needed

discipline, but received none. The mother forbade her husband from exercising any authority over them. William needed restraint as he grew up. A part of the expense of his support consisted of paying fines for him. He was a constant user of the automobile. He used it to drive to school, two blocks away from his home. Naomi was married while a school girl, in the midst of her high-school course. In a year she was divorced, and returned to the high school. Her little boy, Billy, became an added member of the family, and was received with all affection by the defendant. Naomi resumed her high-school course for a period of two years. Winona was a wayward girl, incorrigible at school and at home. She was sent to other schools,—to a convent, and later to a school of religious education, in the hope that she might come under the restraints of some degree of discipline. At 16 she was married in April, and divorced in September of the same year. Before she was 19, she had married three husbands, and had buried none. She returned to make her home with her mother, bringing with her her little daughter, Martha, who also was received affectionately by the defendant. All these extraordinary expenses of divorces and school attendance were drawn out of the bank account. The three children of the plaintiff soon learned to draw checks themselves upon their stepfather's account. For that purpose they used the form of signature adopted by their mother. The evidence shows that approximately three fourths of all the checks drawn on the defendant's bank account during the years of the marriage were signed "M. F. Saunders by wife." This course of affairs was borne patiently by the defendant until December, 1925. It should be said at this point that, soon after his marriage, the defendant had converted his large home into an apartment house, containing two or more apartments. After this improvement, the apartments not occupied by the family rented at $75 per month. The plaintiff was permitted to use this rental as a fund of her own at all times, and to withhold it from the defendant's bank account. Up to December, 1925, defendant's overdrafts and indebtedness had constantly increased. In that year, the plaintiff had drawn upon his bank account approximately $2,500. The president of the bank had had conferences on the subject, both with the plaintiff and with the defendant. He realized that some restraint must come. It was at this point that an event occurred which the plaintiff claims humiliated her

deeply. The defendant gave to the bank a written notice, and the bank accepted service thereof, with the best of intentions. This notice directed the bank to pay no checks from the defendant's account except such as he expressly authorized. He also published a notice to the effect that he would not be responsible to business houses on any account not authorized by himself. No names were mentioned in either notice. He did orally instruct the bank to honor his wife's check, notwithstanding, and did likewise direct certain business houses to extend his wife full credit. Her checks continued to be honored by the bank, and her credit was not impaired with any business house. The scheme did operate as a restraint upon the freedom of the children to draw upon such account. The plaintiff stresses the event as a cruelty committed upon her. The only other item of property that has been available to the plaintiff was her own house at Ottumwa. Shortly after the marriage, the defendant paid off the mortgage thereon, to an approximate amount of $800. Sometime later, the plaintiff sold this property for $2,000. She used the proceeds in the purchase of a new automobile,—the defendant already having one. The foregoing, in brief, is the financial history of the marriage.

Within a few weeks following the marriage, the plaintiff accused the defendant of concealing his property from her, and she has repeated such accusation throughout their married life. She is insisting upon such accusation now. Ignoring such accusation for the moment, we will say that the net result of the family finances is that the defendant's total income from his farm from the date of the marriage up to the date of the trial was slightly in excess of $40,000. To this amount should be added an estimate of receipts from moneys and credits in the first few years of the marriage. The total amount checked out in the same period approximates $70,000. The difference between the total income from the farm and the total amount checked out is represented by the amount of interest received in the earlier years of the marriage and the later borrowings from the bank. These borrowings were made to cover overdrafts, from time to time, and notes were given therefor. These borrowings increased, but never decreased. The total indebtedness of the defendant at the time of the trial amounted to about $17,400, upon which judgments had been entered. The decree in this action imposes further liabilities upon him to an amount approximating $10,000. He

has no other property than his farm and his home. The decree awards to the plaintiff the life tenancy of the home. Her life expectancy greatly exceeds his. The home, therefore, is wholly unavailable to him for the purpose of paying or securing any debt. He must look alone to the farm for the liquidation of his liabilities. Either the farm must be sold and the proceeds applied upon the indebtedness, or, if sale be impossible, then the liabilities must be secured, and accruing interest thereon be paid out of the proceeds of the farm. Evidence was introduced on the question of value of the farm. The witnesses for the plaintiff fixed such value at from $75 to $100 an acre. Those for the defendant fixed the value at from $50 to $60. It is not claimed that the farm could be sold at the present time at either price. It is not a farm which can be deemed highly attractive to a purchaser. It has a large acreage of low, flat land, and likewise a large acreage of rolling land. The low land has no drainage, and suffers seriously in wet weather. The ravines of the rolling land are cut by ditches or gulleys. A considerable part of the rolling land has never been under the plow, and is not deemed tillable. It is not claimed that the improvements are extensive or attractive. Since the marriage, the defendant has suffered two fire losses. Two barns were burned, and the loss thereby, over and above insurance, was upwards of $10,000. This loss is not reflected in the bank account, but is reflected in the selling and rental value of the farm.

If the foregoing is a fair representation of the state of the defendant's finances, then he was justified in every reasonable effort toward retrenchment of expenditures. But the plaintiff insists that an item amounting at least to $15,000 should be added to the foregoing list of assets. The contention is that assets to that amount or more are held by him in concealment, and that they have been so held for many years. There is no evidence offered in support of this contention, except the fact that he had such assets at the time of the marriage. A practical method by which he could conceal such assets from his bankers and from his wife is not suggested. What adequate motive he could have for making such concealment is not suggested. We deem the contention wholly without support in the evidence. What we have already said is a sufficient indication of the reason for our views at this point. We therefore eliminate this hypothetical item entirely from the calculation, and hold that the assets and liabilities

of the defendant are just those which appear affirmatively in the record, and which are enumerated above.

We proceed, therefore, to inquire whether the burden of alimony imposed upon the defendant is greater than can be carried by his available assets. What is the salable value of this farm? Is it $50 an acre or $100 per acre? On this subject we have only the opinions of men who do not want to buy. No prospects are in sight. It avails nothing to the defendant that his farm may be worth more than it can be sold for. The only certain thing that can be ascertained from this record as to such salable value is the annual rental value. This gross rental is $3,000. This is approximately $4.50 per acre. It is conceded that the annual upkeep will amount to $.50 an acre. This reduces the net income from the farm to $2,688. The taxes amount to $900 annually. This reduces the net income to less than $1,800. What amount of capital investment is required to produce $1,800 of income? A capital investment of $30,000 at 6 per cent would produce such income. The outstanding indebtedness of the defendant is drawing 6 per cent and 8 per cent interest. With this certainty of income production before us, we see no reason why we should find the salable value of the farm to be in excess of $50 an acre. It has become notoriously true in this era that land must be sold for less than its reputed value, in order to be sold at all. If this land could be sold for $35,000, the entire proceeds thereof would not discharge the burden now resting upon the defendant. It must be borne in mind that the annuity requirement of $600 would need a capital investment of $10,000, in order to produce it. The defendant must, therefore, obtain approximately $38,000, in order to discharge his indebtedness and his obligations under the alimony decree. This takes no account of a possible remnant for himself. Upon this record, we are satisfied that no such sum could be realized from a sale. Nor is there any evidence in the record that would invite us to the belief that any sale could be made on the basis of opinion values.

One other alternative is to be considered. If we should conceive of an arrangement between the defendant, on the one hand, and his creditors, on the other, including the plaintiff, as such, whereby the creditors should agree to forbear enforcement of their claims if the defendant would pay the accruing interest thereon, could the defendant perform such an agreement out of

his income? The interest on $17,000 to other creditors would amount to more than $1,000; on $7,500 due plaintiff, $450; on the annuities due the little daughter, $600. These three items would amount to a total of $2,100. Not only would the income fall short of payment of the accruing interest, but it would fall short, also, of providing any support whatever to the defendant himself.

From this record we are unable to reach any other conclusion than that the performance of the decree as to alimony would leave the defendant without any substantial support. He is sick, and under great physical disability. His expectancy of life is short. On the other hand, she is a well and capable woman, of good physique and physical ability. Her children, except Margaret, have all arrived at their majority, and have all gone out from under her roof. As between her and her husband, her comparative desert is not prominent in the record. Much of her testimony is not persuasive, and some of it is not credible. The fact that she has been thrice married and thrice separated and divorced at 46 is a circumstance not to be ignored when she asks for the last remnant of her husband's estate. If she bargained for affluence, as she contends, she had it and consumed it in the years when she most needed financial help. The unsatisfactory character of her testimony may be illustrated by an excerpt from her own evidence in chief, as follows:

"Q. When you were first married, and for considerable time, was there any particular trouble? A. Yes, there was. We had been married but about—we were married in June, and sometime in the fall, about November, I said to him one day, 'Mr. Saunders, has Mr. Wuthrich paid your note in yet?'. There was a note to be due. He says, 'Yes, that was paid in before we were married, and I spent the money.' He told me about it before we were married. There were two notes for $5,000 and $8,000. I don't know where he got them. Q. Go ahead and tell what was said or done. A. He just declared that they had been paid in, and he had spent all the money before we were married. Of course, I just thought that was so, and let it go at that. I didn't think any more about it. So, whenever the assessor came around, in January or February, I was in a little bedroom downstairs, making my bed, and I heard him give in one of the notes to the assessor. The assessor at that time was Ed Games, and I stopped him one day on the street and asked him about the note, and he said, 'yes,' Mr. Saunders gave

him a note. It seems to me like it was a $5,000 note at that time. Well, then, it went on a while, and I thought I would ask Mr. Saunders about it, and I gave him a chance to tell me the truth about it. I said, 'What became of the notes you had out?' He said, 'I told you that those notes were paid in, and I spent the money before we were married.' I said, 'Are you sure now? Do tell me the truth. I don't want you to lie to me. I am giving you a chance to tell the truth.' He got all mad and stirred up, and crossed his heart and hoped he would die, God would strike him dead if he wasn't telling the truth, and then I said I heard him give it to the assessor, and '*the assessor also told me you gave it in.*' Then he had to admit it. He said, 'Well, Helen, I have owed money. We have to be careful,'—and tried to make all sorts of excuses about it. Q. Now, what was the next trouble that you remember developed? Was there anything except in regard to the notes and property and things of that kind that developed for a few years?''

We find the foregoing evidence to be partly true and largely untrue. We find it true that she reproached her husband and accused him of deceiving her and of concealing his property, and that she did so at other times, later. It is not true that he had lied to her or deceived her about the Wuthrich note. Nor is it true that she had any information from Ed Games, nor that she had ever talked with him, nor that her husband listed said note with him. Games was called as a witness, and testified positively to that effect. The note in question was one which the defendant had received through the estate of his former wife, and was involved in litigation, which had been settled, and all this before the plaintiff was married to the defendant. Her foregoing evidence is illustrative of a suspicious and querulous disposition and a tendency to exaggerate mere pettiness. Her suspicion that her husband was concealing his wealth from her had already begun, as the incident indicates, and this without any valid reason therefor. Her testimony discloses also that, at the same time, she insisted upon a conveyance to her of some of the real estate, on the ground that he had promised it to her. Whatever quarrel of words they had in their married life was over money, and was usually instigated in a manner similar to the foregoing.

Giving full force and effect to the decree of divorce, we think it must be deemed to rest mainly upon the alleged cruel treat-

ment, consisting of harsh language. Sufficient to say that the conduct of the defendant had great palliation.

Upon the whole record, we reach the conclusion that the judgment and decree for alimony should be modified, and rendered less burdensome to the defendant; and to the details of that modification we turn.

II. The district court awarded the plaintiff the life use of the homestead. As already indicated, this now consists of apartments, in addition to that occupied by the family. These apartments produce a rental of $75 a month. The testimony on both sides fixes a value of $5,000 on this property. The effect of the decree in this form, though it saves the title in remainder to the defendant's estate, is to eliminate it entirely from any availability to the defendant in the financing of his obligations. The limiting of the title of plaintiff to a life estate and the reservation of the remainder to the defendant work no practical benefit whatever to the defendant, as a debtor in distress. We think, therefore, that, in the interest of prudent financing, the fee title and the life estate should be merged in the same person. We think that this property should be set apart to the plaintiff in fee simple, and the decree will be so modified. The decree must be further modified by the elimination of the item of $7,500. The order for the payment of $50 a month for the use and benefit of the daughter Margaret will be sustained, to the extent here indicated. Certain additional provisions for the contingencies of health will be eliminated therefrom. Contingent liabilities serve only to becloud the title of the remaining property.

The judgment for the costs of trial, including the attorney fees for the plaintiff, will be sustained. The costs in this court will be apportioned. The plaintiff, as appellee, will pay her own printing, and no costs therefor will be taxed herein. Other costs will be taxed to the appellant.—*Modified and affirmed.*

FAVILLE, C. J., and MORLING, KINDIG, and GRIMM, JJ., concur.